FROM: 10579062
TO:
SUBJECT: 2241_Stilley1RspMTDBrfPt1
DATE: 03/24/2020 01:19:58 PM



* UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

OSCAR STILLEY, DOJ-FBOP 10579-062           PLAINTIFF

V.        3:19-cv-6 HTW-LRA

WILLIAM BARR, ET AL           DEFENDANTS

    PLAINTIFF'S CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
    1) RESPONSE TO MOTION TO DISMISS, AND
    2) MOTION FOR PRELIMINARY INJUNCTION
        COMMANDING THE GOVERNMENT TO CEASE AND DESIST FROM OBSTRUCTING PLAINTIFF
        AND OTHER INMATES SIMILARLY SITUATED FROM ACCESS TO THEIR OWN PROPERTY AND
        RIGHTS TO PROPERTY, USEFUL AND PROPER FOR THE PREPARATION OF LEGAL PLEADINGS
        AND PAPERS, ETC

Comes now Plaintiff Oscar Stilley (Plaintiff) and for his brief states:

The government filed a motion asking for approximately 50 additional days to file their a responsive pleading to Plaintiff's complaint. The Court granted the motion. The government filed its motions to dismiss on the last day allowed by the order granting extension of time to plead.

Counsel for the government in the motion for extension claimed that she couldn't contact Plaintiff because he is a federal prisoner. This is a false statement. As alleged in Plaintiff's response to the motion to dismiss, Mr. Dontae Dennis, Assistant Supervisor of Education (ASOE) called Plaintiff on the telephone on 2-2-2020, Super Bowl Sunday. If the government doesn't know how to make a phone call to an inmate, they can ask Mr. Dennis. It really isn't hard.

Government lawyers habitually make this false statement. Inmates basically don't have a chance to respond prior to a ruling on the motion. Furthermore, Plaintiff doesn't honestly think he can defeat the first motion for extension of time, even if the government tells a bald faced lie to excuse their failure to comply with applicable rules.

That wouldn't be the real object of any objection anyway. Inmates are notorious for needing extensions of time to plead. We can hardly throw stones from the confines of our glass houses. Plaintiff just wants the government to play by the same rules he has to play by. If the rule is bad, change the rule. If the rule is good, follow the rule. Turn square corners with the court and with the tax paying public that pays the bills.

The government won't take calls from inmates. On 2-24-2020, Plaintiff tried 3 times to call opposing counsel. The 1st and 3rd times a live receptionist picked up the line - and promptly hung up. The second time the call went to voice mail. All the government's claims of inability to originate calls to inmates, and all their excuses for not taking inmate calls, are disingenuous. The origin and full extent of this protocol is not known. Perhaps the government, in its reply, will be so kind as to explain who effectuated this protocol, who enforces it, etc.

Why is this done? Because they're going to get hard questions, and they don't like hard questions. So they just shut off all means of telephonic communication, and then lie to the courts about their DE FACTO protocols, customs, and practices.

1. THE GOVERNMENT'S MOTIONS TO DISMISS ARE LEGALLY INSUFFICIENT.

    A. The government's declaration concerning the FTCA claims lacks sufficient facts to rebut
        the claims of Plaintiff's verified complaint.

The government has submitted a declaration by Joshua Robles, concerning Plaintiff's 8 counts raised under the Federal Tort Claims Act (FTCA) 28 USC 2671 et seq. This declaration, with exhibits, plainly admits that Plaintiff filed the original tort claim, and that a "right to sue" letter was issued in response.

Plaintiff in his verified complaint, at pages 31 through 32, explains why that he was unable to file a complaint in US District Court within the 6 months allowed by the "right to sue" letter. Furthermore, Plaintiff's complaint alleges that he submitted a request for reconsideration within that 6 month time frame. Plaintiff was at the Oklahoma City Federal Transfer Center (OKC-FTC) at the time that his 6 month window of opportunity was expiring. In fact, he was sent to Beaumont Low on 11-13-17, [ Para. 519] which would be some 3 days before the expiration of 6 months after 5-17-17, the date on the right to sue letter. Complaint Ex. 92.

Plaintiff submitted his request electronically, and sent hard copy to the SouthCentral Regional Office of the DOJ-FBOP, (SCRO) precisely because he didn't trust SCRO to be honest about the receipt of mail. Compl. para. 513. If the government had evidence that this isn't true, they could provide a statement under 28 USC 1746 alleging that no such request for reconsideration was ever drafted and printed under the "inmate request to staff" function of the DOJ-FBOP's computers at OKC-FTC.

The drafting is one thing - prints are charged separately. Furthermore, Trust Fund personnel know exactly what has been printed and when. I've had them refuse to re-credit the account for defective prints, saying that my only remedy was a new set of prints. Trust Fund knew exactly what I printed and when, as proven by their replacement prints. This is part of their billing records, which can hardly be erased after 60 days.

The government did not attempt to contradict Plaintiff's statements under penalty of perjury about drafting and printing IRTS documents. Nor did the government use their mail logs from the OKC-FTC to rebut Plaintiff's claims that he mailed this document to SCRO in a timely fashion.

Inmates lose electronic access to Inmate Requests to Staff (IRTS) after 60 days. Plaintiff's experience with transfers is that physical property routinely "disappears." The theory is that things like medication, property receipts, legal papers, etc., can be taken on the bus, and picked up at the institution. There is a massive disparity between theory and reality. Plaintiff has lost prescription medication so entrusted. For the most part, inmates trust this system only when they have no other choice.

Plaintiff has been through the FTC-OKC on 4 separate occasions - one for each correctional complex of confinement. Plaintiff by his recollection had in the past been able to access and print IRTS documents MADE AT OKC-FTC, after arrival at the new place of confinement. This time, no IRTS documents were available to Plaintiff, for review or printing.

If the government claims that it doesn't have the IRTS documents for the time frame in question, it should say so, and why, and whether this is anomaly or standard practice. Plaintiff is quite confident that the government keeps archives of these documents. After all, the National Security Administration (NSA) has for many years swept up all or virtually all internet traffic. Whether or not this is precisely the case, it makes absolutely no sense for the DOJ-FBOP to fail to keep ITS OWN records that would prove or disprove claims about matters known preparatory to litigation. Nobody has made any such claim, at the present time.

The Code of Federal Regulations allows an FTCA tort claimant to file a request for reconsideration, pursuant to 28 CFR 14.9(b). If this is done, the agency has 6 months from the date of the request for reconsideration to make a new determination, and to issue a new "right to sue" letter. Furthermore, it really doesn't matter which agency receives the claim, as long at the recipient can discern what federal agency should decide the claim. See 28 CFR 14.2(b)(1). Also, 28 CFR 14.2(b)(2) provides that a tort claim presented to one agency can be re-assigned to an agency better situated to consider the claim. Subsections 3 and 4 of that regulation make it clear that a claimant can submit a tort claim to more than one federal agency.

Plaintiff sent another letter, along with a tort claim that he requested to be construed NOT ONLY as a re-submission of the old tort claim, but also as a new tort claim. Complaint. Ex. 91. Plaintiff submitted this to SCRO as well as his new region of confinement, SouthEast Regional Office of the DOJ-FBOP (SERO).

Mr. Robles says he's the custodian of records, but he says nothing at all about what was sent to Plaintiff from SERO. SERO plainly sent Plaintiff SOMETHING - we can see that from the envelope postmarked 7-10-18. Plaintiff indeed complains about the fact that SERO sent Plaintiff nothing on its own letterhead. However, SERO did in fact place a file stamp on page 1 of the tort claim. At the bottom of the document someone at SERO has suggested that the submission is a duplicate. See Exhibit "1" to the Plaintiff's response to motion to dismiss.

TRULINCS 10579062 - STILLEY, OSCAR AMOS - Unit: YAZ-G-A
----------------------------------------------------------------------------------------

FROM: 10579062
TO:
SUBJECT: 2241_Stilley1RspMTDBrfPt2
DATE: 03/24/2020 01:21:10 PM

Mr. Robles' records therefore necessarily fall short of completeness. His records contain no information about this submission to SERO - despite the fact that a cursory reading of Plaintiff's complaint would disclose the allegation that the request for reconsideration was sent to SERO. His exhibits include "case details" of multiple claims. There are 6 tabs for each case, including one that says "case dates." We cannot see what's behind the "case dates" tab for TRT-SCR-2017-932.

On motion to dismiss the plaintiff's allegations in a verified complaint are presumed true. WILLIAMSON V. TUCKER, 645 F. 2d 404, 412 (5th Cir. 1989) Furthermore, the fact that SERO received a tort claim, based on reconsideration as well as new submission theories, on or about 6-26-18 is not subject to reasonable dispute. SERO put its own stamp on the document, including the date.

However, the right to pursue Plaintiff's claim is at least partly predicated on his having submitted a request for reconsideration within 6 months of the original "right to sue" letter. Of course, the DOJ-FBOP has a continuing duty to provide adequate medical and dental care to all inmates. Plaintiff has a right to submit a tort claim at any time, provided he is willing to content himself with the 2 year limitation period. Plaintiff sought reconsideration, amongst other reasons so as to eliminate any complexities about the cut-off date as to claims raised in the tort claim documents.

There are two sources of information to verify or rebut Plaintiff's claims, with respect to his claimed request for reconsideration. One is the archives of IRTS documents and print jobs during the time that Plaintiff was at OKC-FTC. The other is the outgoing mail logs from Plaintiff's housing unit, during the same time period.

The government presents no evidence whatsoever, from either of these sources. The fact of the matter is that Plaintiff is not lying. Plaintiff still has a list of more than 40 inmates from Forrest City Low, that he had helped with tort claims. Plaintiff knew what was required of him, in order to preserve his legal rights.

The government cannot deny that Plaintiff sent a letter asking about his request for reconsideration, on 12-13-17. Mr. Sickler responded to that letter on 1-3-18. Plt. Complaint Ex. 94. This raises a serious question. Why would Plaintiff FAIL to timely send a simple letter, asking for reconsideration, and THEN send a letter asking about his request for reconsideration? That doesn't even make sense.

Claiming that the request for reconsideration was drafted on the IRTS system and submitted to staff would make even less sense. If that was false, it would be an easily falsifiable claim. Furthermore, as a second line of defense, the government could promptly secure copies of the outgoing mail logs for the times relevant to Plaintiff's claims. Presumably those are stored electronically, such that they would be available in case of litigation, without undue effort.

The fact is that Plaintiff has pleaded a satisfactory case showing that his tort claims are live and viable for litigation. The government, full well knowing Plaintiff's legal theories, has tacitly admitted that Plaintiff's verified claims are the truth. The government not only fails to address Plaintiff's allegations head on - it also engages in obfuscation indicative of knowledge that Plaintiff's allegations are true.

  B. The government's claims of failure to exhaust other administrative remedies proves their defense is nothing more than an attempt at delay.

The government claims to have held Plaintiff to a 0-20 record, on the exhaustion of administrative remedies, covering a period of time in excess of 7 years. This in itself tends to show that the remedies were not "available" within the meaning of the law.

The government has thus made an issue of Plaintiff's competence. The US Supreme Court in ROSS V. BLAKE, 195 L. Ed 117, 127 (2016) cited to a prior case in which the Court recognized that officials might devise procedural systems in order to "trip[] up all but the most skillful prisoners." Remedies under such schemes are not "available" within the meaning of ROSS V. BLAKE.

The Solicitor General of the United States filed an amicus brief arguing that remedies are unavailable when "NO reasonable prisoner can use them." Id. (Emphasis added) The Solicitor General's interest was to try to uphold a system in which ALMOST nobody can successfully "exhaust" a remedy to the satisfaction of prison authorities. The Solicitor General already knew that the DOJ-FBOP maintains a system in which prison authorities can deny ANY inmate a final decision and admitted exhaustion. That's why the Solicitor General of the United States chose to file a brief and argue in a case involving the state of Maryland

and one of its prisoners. The DOJ-FBOP lives in a glass house, and wished to advocate against allowing inmates to use (entirely rhetorical) stones to attack the evil upon which the DOJ-FBOP's house is built. Thus the extreme arguments from the Solicitor General.

If an inmate has a total dog of a case, and no ability to litigate effectively, the DOJ-FBOP might well admit that the inmate has exhausted remedies, out of their own dishonest self interest. They need a handful of administrative remedy requests to filter all the way through to the top. If NONE get through, the fact that the remedies are in fact "unavailable" is too obvious to deny. However, the DOJ-FBOP does INTEND TO, and in fact DOES maintain a system in which the prison authority can and does feign failure to exhaust, on ANY remedy that it so chooses. Diligence and expertise are NEVER enough, when the DOJ-FBOP wishes to claim failure to exhaust.

Consider now the major facts bearing upon the competence or incompetence of Plaintiff, in the following numbered list.

   1) Plaintiff started with a GED, and earned a BSBA in Administrative Management in 3 years, magna cum laude, from the University of Arkansas at Fayetteville, despite skipping 2 spring semesters to work to earn money for expenses.

   2) Plaintiff immediately thereafter completed law school in 2 1/2 years, also at UA Fayetteville.

   3) Plaintiff practiced law for some 19 years before coming to prison.

   4) Roughly the latter half of Plaintiff's practice was mostly in various jurisdictions that required Plaintiff to learn and follow a new set of rules for each case. Nevertheless, Plaintiff almost never incurred a procedural default.

   5) Much of Plaintiff's practice, in the later years, involved federal tax or securities law, or was officially designated by a US district court as "complex," or some combination thereof.

   6) Plaintiff has assisted well over 50 federal inmates with FTCA tort claims, and has assisted other inmates with administrative remedy requests, on a routine basis.

It is simple enough for the government to research the cases in which Plaintiff was counsel of record outside the State of Arkansas, the Western District of Arkansas, and the 8th Circuit. If Plaintiff's claims of expertise are challengeable, the DOJ-FBOP is invited to challenge them. The government is invited to request a release for educational records - that will be supplied posthaste. Plaintiff's counselor would supply a copy for immediate signature and prompt return via scanned pdf. If Plaintiff is exaggerating his educational attainments, it won't be hard to prove it.

Plaintiff's skill set and experience puts him in the top 1% of all inmates, for legal and administrative skills. If the DOJ-FBOP can hold Oscar Stilley to 0 and 20 over a decade, what chance does the average inmate have, to successfully exhaust a claim the DOJ-FBOP wishes to evade? The DOJ-FBOP has great numbers of inmates who don't have skills sufficient to pass the GED test. Plaintiff believes that 40-45% of incoming federal inmates lack GED skills, but doesn't have authoritative information as to the statistics. Perhaps opposing counsel can supply this information.

The facts give rise to certain reasonable inferences. First, anyone who starts with a GED and earns a business degree from a flagship state university, with high honors, in 3 years, while skipping two semesters to earn the money, has DRIVE. In fact, this was Plaintiff's drive. He had encouragement from others, for which he was and is most grateful, but it was not pushy parents that drove Plaintiff to his performance. In fact, Plaintiff's father didn't show up for the graduations - either from college or law school.

Second, this accomplishment is evidence of intelligence applied to a goal, over a long period of time. It goes without saying that a college degree provides social and economic advancement. The reasons for wanting a degree are obvious. However, very few individuals are able to calculate and plan sufficiently to accomplish such a goal in 3 years, much less while skipping two regular semesters. A solitary mistake in the ordering of classes could easily render this goal impossible. Often a line of classes are prerequisite to successor classes. Finishing a degree with 4 regular semesters plus 15 weeks of summer school plus 50 hours of nontraditional credit requires thorough understanding and careful attention to these details early in the process.

Many lawyers practice law and do it with admirable professionalism. Very few lawyers impose upon themselves the requirement to learn a new set of local rules with nearly every new case taken. The ability to do this reliably over a long period of time is solid proof of the ability to learn and comply with the rules of a tribunal.

The defendants have inadvertently proven, beyond a reasonable doubt, that the supposed remedies Plaintiff allegedly didn't exhaust weren't "available" within the meaning of ROSS V. BLAKE. Any system that systematically crushes a plaintiff with the demonstrated capabilities shown in the case of Oscar Stilley, every single time, in at least 20 remedies over more than 7 years, does not offer "available" remedies, within the meaning of the law. Ms. Singleton's claims are in irreconcilable conflict with other government testimony about Plaintiff's remedies - not that it matters for purposes of the motion to dismiss or motion for preliminary injunction. See Dkt. 1, pg. 49, para. 840, where Plaintiff alleges that another Assistant US Attorney (AUSA) argued that Plaintiff has filed 31 remedies but only exhausted one.

Plaintiff's allegations concerning his qualifications are verifiable. If the government decides to quit lying to itself about whether or not it has telephone access to ITS OWN prisons, it can immediately get a educational record release from Plaintiff. Email the document to Mr. Henderson, Plaintiff's counselor at FCC Yazoo City Camp. Draft the release to say that a copy is equivalent to an original, absent substantial dispute as to authenticity of the signature. Get Mr. Henderson to send it back to opposing counsel, to forward it to the proper record keepers.

Plaintiff is saying that the college transcript will show a degree with high honors on 1) 4 regular semesters, plus 2) 15 weeks of summer school, plus 3) Fifty hours of non-traditional credit, most of which was earned with scores at or above the 90th percentile. If that's not true in every material respect, then show it to the Court. Show that Plaintiff wasn't honest and forthright with the Court - if in fact Plaintiff's claims are falsifiable.

What's in it for me? Just be honest and fair, and give me copies of everything the government gets, with respect to educational records. Any release should state specifically that Oscar Stilley, as subject of the record request, will be provided with a copy of all records released.

    2.    PLAINTIFF HAS LEGAL ENTITLEMENT TO A PRELIMINARY INJUNCTION TO PROHIBIT THE GOVERNMENT FROM INTERFERING WITH PLAINTIFF'S RIGHT TO POSSESS AND USE HIS OWN PROPERTY FOR THE PURPOSE OF PREPARING AN APPEAL BRIEF IN HIS DIRECT APPEAL, ETC.

    A. Legal standard.

A party seeking a preliminary injunction generally must show 1) a substantial likelihood of success on the merits, 2) irreparable injury if the injunction is not granted, 3) that the injury outweighs any harm to the other party, and 4) that granting the injunction will not disserve the public interest. CARDONI V. PROSPERITY BANK, 805 F. 3d 573, 579 (5th Cir. 2015).

    B. Likelihood of success.

As a matter of law, Plaintiff is entitled to the use of his own property to prepare and file a brief in his one direct appeal. EX PARTE HULL, 312 US 546, 85 L. Ed. 1034 (1941); JOHNSON V. AVERY, 493 US 483 (1969); WOLFF V. MCDONNELL, 418

US 539). Plaintiff isn't asking the DOJ-FBOP to GIVE him anything. If the government wants to monitor Plaintiff's internet traffic, that's fine. But he isn't asking for their help or their property or rights to property. He is asking the Court to order the government to REFRAIN FROM INTERFERENCE with Plaintiff's possession and reasonable use of his own property, for the vindication of his own constitutional right of due process.

C. Irreparable injury.

The question might be raised, Stilley, can't you wait until a trial, prove your case, and then get the injunction? That's a good question but it comes with a good answer. In STILLEY V. US, Eastern District of Arkansas (EDAR) 2:15-cv-163 BSM/BD, Plaintiff propounded discovery. The government produced 2,899 pages TO ITSELF. See e.g. EDAR 2:15-cv-163 dockets 47, 74-78, and 86-89. These "responses" were never "served" on Plaintiff, within the plain language of rules and decisions concerning the service of discovery responses (or other papers) on an opposing party.

Plaintiff repeatedly begged and pleaded to get a copy for himself. Id. Dkt. 90-1 pg. 1-2, Dkt. 93, 96 @ para. 19. Those requests were all denied or ignored. Plaintiff begged and pleaded for this information to be posted to DropBox or other suitable place so Plaintiff could make a set for his own use. No such luck. It was utterly impossible for Plaintiff to make so much as one copy of one page of this discovery, with which he might resist the government's motion to dismiss.

Judge Miller granted summary judgment and declared the issue of discovery to be moot. Plaintiff appealed to the 8th Circuit and tried to get the discovery either by motion to the 8th Circuit or by remand after a ruling on the merits. STILLEY V. US, 8TH CIR. 18-2188. Plaintiff never got this information, and the district court ruling was affirmed. It is still in the possession of Plaintiff's adversary. It includes a lot of medical records. Plaintiff doesn't have them, but his enemies do.

It might be argued that this is water under the bridge, that Plaintiff lost and needs to move on. However, US District Court Judge Charles Shaw, during proceedings in his court, (unrelated to this case) after a loss at the 8th Circuit in an appeal of another of Plaintiff's cases in Shaw's court, commented, "I don't think they [the 8th Circuit judges] like you."

This cost Plaintiff $400 for the district court filing fee, plus $505 for the appeal, plus a large sum for the cost of Trulincs, at $3 per hour, plus the cost of printing at 15 cents per page, and 13 cents per page for copies. At the barest minimum this took over $1,000 out of Plaintiff's pocket, yet Plaintiff wasn't allowed to respond with so much as one page of discovery. In fact, the docket shows that Plaintiff wasn't allowed to object at all, to the report and recommendation for dismissal. Nor was he allowed to be reasonably heard afterward, either through postjudgment motions, or through appeal. None of the medical records (except those favorable to the government) had been entered into the district court record. Therefore, he was forced to appeal with none of the critical evidence admittedly responsive to Plaintiff's discovery requests.

Unless the Court grants this motion, nothing stands in the way of the government doing the same thing in this case. They've already engineered a winning strategy, one that works like a charm no matter how strongly the facts and the law favor their adversary. They just prevent their opponent from placing the pertinent evidence in the district court record.

Plaintiff mostly doesn't get paid for his prison employment. For the last 4 months Plaintiff earned $27.72 per month. Plaintiff's IN FORMA PAUPERIS motion (Dkt. #2) was denied, but the facts are laid bare. In the second half of 2018, records from this pleading show Plaintiff put $1,020 on Trulincs, (a close approximation of actual Trulincs use) had $1,300 of deposits, and made $1,319.25 withdrawals, over the 6 months. From this document it is plain to see that Trulincs is the far and away the biggest drain on Plaintiff's economic resources.

* D. The US Department of Justice has been eviscerating due process and the 1st Amendment right of peaceful petition, for decades.

The old adage is "cheat me once, shame on you, cheat me twice, shame on me" is never more appropriate than here. Maybe the rulings in STILLEY V. US are "law of the case" in EDAR 2:15-cv-163. Those rulings are NEITHER law of the case, nor binding authority, nor reasonably persuasive authority, in this case. Rather, they're proof of just one more set of evil deeds in a ten year campaign to crush the litigating abilities of Oscar Stilley, and to deny him due process in his criminal case.

Make no mistake, the mighty US Department of Justice has been waging a war on due process, for literally decades. Strong words indeed, but totally true. Consider a thumbnail sketch of the major changes wrought by the US DOJ over the past few decades.

   1) Stay pending appeal is all but abolished, ensuring that nearly all defendants will go to prison pending appeal;

   2) Persons in jail or prison are denied access to their own property and rights to property for purposes of appeal, even when that property could and would be used for educational purposes. This is true even when the defendant goes to a low security institution such as a camp.

   3) Congress is tricked into spending ever greater sums for "education" while the DOJ makes sure that the money is not used for the cheapest yet the most valuable educational resource of all - an ordinary computer with reasonable software, hooked up to a good server, with access to appropriate internet resources. That being said, some federal prisons (such as Pollock Medium in Louisiana) do keep computers for inmates, allowing the inmates to save files and edit them later, at no charge. Plaintiff has never been in such a prison.

   4) Inmates are relegated to one 2255 in addition to the one direct appeal to which they are entitled under the law.

   5) The time for the 2255 is limited to 1 year, which allows the DOJ-FBOP to use SHU (Special Housing Unit, or jail for the prison) punitive transfers, and other tactics to wreck the litigating abilities during the time that the 2255 filing period remains open. The DOJ-FBOP can then feign concern over education without giving the inmate a chance to correct illegal sentences.

   6) The DOJ engages in a pattern and practice of destroying their criminal targets financially before bringing an indictment.

   7) Federal inmates are forbidden to engage in remunerative activities, through a prohibition on "running a business," while real pay for prison jobs is constantly depressed, and writing resources are priced vastly above cost plus a reasonable markup for profit. As a result, the effective litigation capacity of federal prisoners is pushed to near zero.

The government will probably protest that it is too much to accuse them of trying to crush the abilities of defendants generally, to gain access to those things necessary and proper for due process. However, Plaintiff isn't trying to hurl invective at any particular individual. The stated and BONA FIDE goal of this pleading is to get the access he should have had from day one. Almost ten years have passed by. That's water under the bridge, as far as this US Attorney and this Court are concerned. It is history, but all cases are based on history. History is FACTS, the reality that is presented to courts in support of a desired ruling.

The accusation is the truth. The DOJ set out to purposefully convict and incarcerate innocent persons, and deprive them of the means to effectively resist, all in willful, flagrant, conscious violation of US Supreme Court precedent. Between the time of EX PARTE HULL in 1941, and BOUNDS V. SMITH, 430 US. 817 (1977) in 1977, none of the evils listed above were established in the federal system. Persons with reasonable grounds for appeal were allowed to stay out pending appeal, to help their lawyer or to do their own appeal, using the best resources they could find. Anyone could file a habeas (28 USC 2255) petition, at any time. There was no statute of limitations for habeas corpus petitions. If you were obstructed from access to the law at first, you could vindicate your rights when you learned of the true state of the law as applied to the facts of your case. There was no REASON to try to intimidate inmates into remaining silent, because that sort of behavior would have to be maintained for the duration of the incarceration.

The US DOJ has nothing to say in response. That's why MULTIPLE Attorneys General refuse to give any substantive response

to Plaintiff's offers of donation. Plaintiff estimates that in addition to his own, he has helped about 10 other inmates make essentially the same offer. The Attorney General won't respond - AT ALL. The Attorney General knows that he can't put words on paper, that make the slightest sense, and still refuse the offer.

This calls for just a bit of explanation about motivations. This probably looks like altruism and philanthropy. To some extent, that is in fact the truth - but that's far from the sole motivation.

Consider the realities. If Plaintiff's Trulincs bill is now about $2,000 per year, what does it do to him if he can get a good computer with good software, that he knows well? It doesn't just cut the cost of basic computer time, for such things as word processing, by at least 75%. It makes Plaintiff drastically more efficient and effective than he is now. Plaintiff probably could do 3 or 4 times as much work, in the same amount of time now devoted to legal work.

Furthermore, it puts quality legal research software at Plaintiff's fingertips, at a very good price. Plaintiff at the present time can't access Arkansas and Oklahoma state statutes and decisions - even though both are indispensable to a competent direct appeal. Plaintiff can't access attorney ethics rules and decisions from either jurisdiction - even though such authorities go to the heart of Plaintiff's criminal appellate arguments. Plaintiff cannot access the Code of Federal Regulations (CFR) for the years of conviction, specifically 2003 and 2005. These versions of the CFR are available for free online, and critical to Plaintiff's defense. Plaintiff is utterly denied access to these resources.

Long pleadings require better resources, but quality writing resources don't lengthen pleadings. Rather, they shorten and focus them. Plaintiff asked for an extension to 3-19-20, and was graciously given until 3-25-20. Plaintiff needed every day of it, but wasn't able to do the serious editing that he would have done if he had access even to such basic tools as "cut and paste" and auto-number for lists. Word processors enable a good writer to say more with less, through the production of better organized, cleaner, more focused writing.

TRULINCS 10579062 - STILLEY, OSCAR AMOS - Unit: YAZ-G-A
----------------------------------------------------------------------------

FROM: 10579062
TO:
SUBJECT: 2241_Stilley1RspMTDBrfPt5
DATE: 03/24/2020 01:25:21 PM

\* E. The injury to Plaintiff outweighs any potential harm to the other party.

As of 4-22-2020, Plaintiff has been in prison 10 years flat, day for day. Plaintiff was sent to jail on 4-23-2010, and denied bail pending appeal. Plaintiff filed his notice of appeal. The 10th Circuit assigned appeal number 10-5057 applied to Plaintiff's direct criminal appeal. Plaintiff has filed a plethora of motions seeking injunctive relief sufficient to allow him to file the opening brief the one direct appeal to which he is entitled under the law, both in his appellate case and in his district court case, Northern District of Oklahoma (NDOK) 4:09-cr-43 SPF.

The upshot is that Plaintiff has been relegated to the administrative remedy process of the DOJ-FBOP, for the purpose of seeking permission to use his own property in order to prepare and submit a creditable appeal brief to the 10th Circuit Court of Appeals. Plaintiff was PRO SE, whereas his co-defendant Lindsey Kent Springer had counsel on appeal. Plaintiff's appeal was partially consolidated with Springer's appeal. NDOK 4-09-cr-43, Dkt. # 362.

The DOJ, and its subsidiary the DOJ-FBOP, has shown nothing but utter contempt and total hostility to Plaintiff's right of reasonable access to the courts, for the purpose of preparing and submitting a well researched, well written, properly formatted appeal brief. Consider the following facts.

    1) Plaintiff as an experienced attorney had a laptop computer with all his legal files, plus internet access, plus a subscription to Lexis-Nexis (the real thing, not the dumbed down ersatz "Lexis-Nexis premium" that is so wretched that it couldn't be given away, in the real world), plus software suitable for a law office, plus printing capabilities, plus suitable office equipment and supplies, all on his laptop as well as his office computer, at the time he was locked up. Dkt #1, pg. 62-64, esp. para. 1,089.

    2) Eric Rudolph, who bombed abortion clinics and also attempted to bomb the Olympics held in Atlanta, Georgia, was allowed a laptop computer in his cell, to organize, sort, search, and otherwise use the legal discovery and pleadings in his own case. Dkt. #1, pg. 66.

    3) Plaintiff has repeatedly made respectful request for access to hard and soft copy of his criminal court case files, in order to prepare a creditable appeal brief, for filing. Dkt. 1, pg 62, para. ## 1056, 1063.

    4) The government worked with state officials, in an attempt to get Plaintiff suspended pending disbarment prior to the indictment against Plaintiff. Dkt. 1, pg. 61, para. 1,029.

    5) Federal authorities by getting Plaintiff suspended pending disbarment wrecked Plaintiff's finances so thoroughly that he was IN FORMA PAUPERIS during and after his criminal trial. Id. para 1,034.

    6) Stephen P. Friot, Special Judge, denied Plaintiff's unopposed motion [NDOK 4:09-cr-43, Dkt. 254] for an order to produce the trial transcripts promptly, so as to allow Plaintiff time to prepare appeal brief arguments for issues of criminal liability. See Judge Friot's order Id. at Dkt. 278.

    7) As can be seen by the allegations of the verified complaint, the government has abused and persecuted Plaintiff consistently over a 10 year period, for attempting to vindicate his constitutional right of reasonable access to the courts.

    8) Amongst other things, Plaintiff has spent over 400 days in SHU (Special Housing Unit, or jail for the prison) on hunger strike, mostly as a result of altogether bogus and retaliatory "shots" (formal disciplinary incident reports). Pltf's Rsp. Mtd. p. 3, para. 50.

    9) Plaintiff in the count of the indictment involving 2005 was alleged to have paid $250,000 out of his IOLTA (Interest on Lawyers Trust Account) account. However, such payment was admittedly and without fail to the "person entitled" to the money.

    10) Failure to pay out this money to the "person entitled" would have been a violation of the Arkansas ethical rules for attorneys, Arkansas criminal law, Arkansas civil law, and probably other laws as well. See factual allegations at the end of motion for preliminary injunction filed contemporaneously herewith.

11) Plaintiff has no access to Arkansas state law, even though his appellate defense necessarily hinges on the state law of Arkansas, including statutes and decisions, and the ethical rules for attorneys as well as the decisions. Mtn. for Prelim. Inj., para. 40. Plaintiff also needs similar authorities from other states. The Standards for Adult Correctional Institutions, 4th Edition (Standards, 4th Ed.) say that state law should be provided to inmates, [Expected Practice # 4-4276, comment] but the DOJ-FBOP ignores this authority.

12) The DOJ-FBOP intentionally omits important criminal or civil cases from its "Trulincs Premium," or deliberately makes them impossible to find without "workarounds." Dkt. 1, pg. 64.

13) The DOJ-FBOP intentionally makes its software so difficult and cumbersome to use as to drastically impair and impede inmates of ordinary abilities and resources, from effectively briefing their legal issues to courts. Id., esp. para. 1,013.

14) The DOJ-FBOP has intentionally denied inmates reasonable access to Bloomberg's BNA Criminal Law Reporter, precisely because it provides effective and usable synopses of important criminal cases. However, because Plaintiff doesn't have access to any working copier, he cannot attach a copy of the notice of termination.

15) The government, in Stilley v. US et al, Eastern District of Arkansas (EDAR) 4:15-cv-163 BSM/BD, served 2,899 pages of discovery on Stilley's ADVERSARY the DOJ-FBOP, and consistently refused to let Stilley have access to a copy of that file, so he could make copies for use in the litigation. See e.g. Id. Dkt. 90-1 and 92-0. See also page 6 of this brief, for further citations to the record.

F. Plaintiff is necessarily entitled to the relief sought.

Plaintiff was convicted on 3 counts, for each of which the government and the district judge, Stephen P. Friot, claimed a 5 year maximum sentence. That being said, as of 4-22-19, Plaintiff will have served 10 years, day for day. Supervised release is part of the sentence for the underlying conviction. US V. VENABLE, 4th Cir. 19-6280 (10-30-19). Therefore, if ONE out of the 3 counts of conviction falls, Plaintiff is entitled to walk free of both prison and supervised release.

Consider certain facts about Plaintiff's conviction. Plaintiff is alleged to have 1) conspired to defraud the United States, under the "defraud clause," 2) evaded the taxes of his co-defendant Lindsey Kent Springer for the tax year 2003, and 3) evaded the taxes of his co-defendant Lindsey Kent Springer for the tax year 2005.

Focus on the year 2005, since the defeat of that single count lets Plaintiff walk out of prison a free man. The salient facts are set forth below. See the end of the Motion for Preliminary Injunction for statements of fact under penalty of perjury.

1) Dr. Patrick Turner, a dentist, retained Plaintiff's services with respect to a federal criminal tax investigation.

2) Dr. Turner deposited $250,000 in Plaintiff's IOLTA account, a reasonable sum considering the fact that Plaintiff sometimes wrote checks for his client's back taxes and send them to the IRS, along with back tax returns.

3) Before Plaintiff did any work on the Turner case, the government terminated the criminal investigation, choosing instead to proceed with a civil investigation.

4) Dr. Turner decided to use another lawyer for the civil tax investigation.

5) Dr. Turner loaned the $250,000 to Lindsey Kent Springer.

6) Plaintiff paid the money to the "person entitled," which he as duty bound to do, under Arkansas ethical rules for licensed attorneys. Such payment was also required under the civil and criminal statutes and decisions of the states of Arkansas and Oklahoma. Failure to make these payments would have exposed Plaintiff to BONA FIDE criminal and civil liability, as well as the loss of his bar license for legitimate ethical violations.

7) None of Plaintiff's acts with respect to the Turner count of the indictment (Plaintiff doesn't have a copy of his own indictment - the DOJ-FBOP returned it to sender) involved any acts or omissions within the Northern District of Oklahoma.

8) There is not the slightest evidence that Plaintiff took the case as anything other than a BONA FIDE case, which was of the kind that he normally took, in his own area of expertise and practice.

TRULINCS 10579062 - STILLEY, OSCAR AMOS - Unit: YAZ-G-A
--------------------------------------------------------------------------------

FROM: 10579062
TO:
SUBJECT: 2241_Stilley1RspMTDBrfPt6
DATE: 03/24/2020 01:26:36 PM

Two things should be considered. One, Plaintiff took an oath as an attorney at law, which amongst other things included a pledge not to decline anyone's cause for reasons personal to the lawyer. Going to prison for a very long time would doubtless qualify as a "reason personal" to the lawyer who took the case.

It is almost certain that the government was engaged in illegal surveillance, in defiance of the 4th Amendment. It is almost certain that they learned that Plaintiff was the lawyer and discontinued the criminal investigation of Patrick Turner for that reason.

How does Plaintiff draw that conclusion? Plaintiff in 2004 drafted the appeal brief for Judy Patterson, the wife of Plaintiff's client Eddy Patterson. Eddy Patterson fired Plaintiff but told him to do whatever his wife requested. The government asked for and got two extensions of time to respond. Rather than respond, they got an order under Federal Rule of Criminal Procedure (FRCrimP) 35, and granted Judy Patterson immediate release - on condition she drop her appeal.

The government filed a totally fraudulent Rule 35 motion, not because Judy Patterson provided "substantial assistance" within the meaning of the law, but because she had a meritorious appellate argument under the federal Paperwork Reduction Act, 44 USC 3501 et seq. She testified that she hadn't talked to any government official, prior to leaving prison. The government lawyers lied through their teeth to evade the argument, and AT THE SAME TIME, started a criminal investigation on Plaintiff, Lindsey Kent Springer, and Jerrold Barringer. Barringer had "read and signed" the winning brief drafted by Plaintiff.

Back to the main point, anger over the fact that Plaintiff provided competent services, and wouldn't sell his clients down the river, is not a good reason to claim that the ordinary and customary practice of law constitutes a crime. If Plaintiff is wrong in his conclusions, the government should take this opportunity to explain.

One might surmise that no state or federal court would ever punish a lawyer for declining to represent someone, merely because they had the prescience to know that merely agreeing to help would be assigned as the linchpin for criminal prosecution. After all, that makes no sense whatsoever. The right to counsel of choice, or to defend pro se, is enshrined in the constitution. Who would attack this pillar of our western civilization?

It turns out the Arkansas Supreme Court has no such compunctions. Plaintiff was disbarred, by order of 11-4-2010, in LIGON V. STILLEY, Arkansas Supreme Court #08-73. [The customary citation is unavailable due to the obstructionism of the DOJ-FBOP.] The Arkansas Supreme Court adopted the findings of fact and conclusions of law entered by the special judge. Stark Ligon claimed that Plaintiff had committed "a breach of the obligation of [Stilley's] oath of office as an attorney-at-law, due to his general tone of disrespect for the attorney code of ethics." While such language is hardly a model of precision and definiteness, it would reasonably encompass the failure to reliably adhere to the promise not to refuse any cause for reasons personal to the lawyer. Stated RELUCTANCE on the part of the Arkansas Supreme Court does not nullify the fact the conclusions of law were ADOPTED.

That being said, Plaintiff at least arguably had AN ETHICAL DUTY to take Turner's case. Assuming arguendo that Plaintiff knew that the case would pay him ZERO and cost him 5 years of his life, that just means that declining the case is MORE of a rejection of the cause of the oppressed, for reasons PERSONAL TO THE LAWYER.

Plaintiff isn't trying to litigate his criminal appeal, IN THIS CASE. Plaintiff doesn't have a copy of the transcripts, nor a copy of the docket items, except a few scattered, mostly late docket items that were sent to him after he was locked up. Plaintiff did at one time have the transcripts, but lost them during one of the retaliatory transfers that he suffered. Plaintiff isn't accusing DOJ-FBOP of misconduct with respect to that loss - he only asks for the chance to fix the problem, with his own property and rights to property. Lack of the transcripts leaves Plaintiff without the barest essentials necessary to actually argue his case.

Plaintiff is trying to GET A CHANCE to prepare and tender a well reasoned, well researched appeal brief, to the 10th Circuit. Plaintiff has already asked his sentencing judge to order the DOJ-FBOP to cease and desist from obstructing his reasonable access to the courts. NDOK 4:09-cr-43, Dkt. 443. Judge Stephen P. Friot opined that Plaintiff had not, at the time, exhausted the administrative remedies of the DOJ-FBOP. Id. Dkt. 455.

The government probably won't appreciate the pointed accusations of INTENTIONAL, SYSTEMATIC assaults on the constitutional right of reasonable access to the courts. However, the government has at all times had perfectly satisfactory and

reasonable opportunities to provide the equipment necessary to "even the playing field" between the government and federal criminal defendants. In jails and prisons, at every security level, the DOJ has had the power to provide inmates with a broad selection of quality software, access to HONEST legal research software, comparable to that available on the street. There is no issue of difficulty. The difficulty lies in depriving the inmates, and giving the DOJ's actions the slightest veneer of respectability.

The DOJ has done everything within its power to crush the ability of its detainees, to prepare proper and creditable appeal briefs, and other legal papers, or otherwise exercise 1st Amendment peaceful petition. It does this regardless of the security level.

At the present time, FCC Yazoo City Camp sends vehicles to Jackson, Mississippi, or its environs, on a daily basis. Up until the advent of the coronavirus, there was no reason that Plaintiff couldn't leave, for the purpose of finding an office at which to do his legal work. For the foreseeable future, that option is admittedly unworkable, simply because inadvertently bringing coronavirus back to this prison complex would LIKELY result in the deaths of somewhere between 40 and 100 individuals on this complex alone, assuming near 100% infection rates, and a fatality rate roughly between 1 and 2.5%. This prison complex can't provide essential medical and dental care in the best of times - much less in a pandemic.

    G.   Plaintiff's requested relief serves the public interest.

The DOJ-FBOP still has the reasonable option to allow Plaintiff to order in computers, hook them up to DOJ-FBOP servers, and use their equipment properly, within the bounds of legitimate rules, to prepare and print quality legal documents. There is only one plausible reason that the DOJ-FBOP has for almost 10 years denied Plaintiff AT LEAST one of these options. The government doesn't exhibit the slightest confidence that Plaintiff is ACTUALLY guilty of any crimes. The government doesn't believe it had venue over Plaintiff, in the Northern District of Oklahoma (NDOK). However one might say it, but for this evil motive, the DOJ would never expend the political capital necessary to keep Plaintiff in prison in defiance of due process.

Denying Plaintiff reasonable access to his own property and rights to property for purposes of his appeal and other proper legal work SQUANDERS political capital, for little return. Plaintiff is near to entitlement to half-way house placement, probably within a year if the FSA and basic rationality is respected. This could be extended by 5 months if Plaintiff is forced to serve the GCT lost due to retaliatory and bogus "shots." This could be extended by another year if Plaintiff does not get the benefit of 18 USC 3632 (d)(6), which says that FSA "time credits" must be cumulative to any other benefits. But a reasonable and fair application of the law to the facts indicate that Plaintiff should be in halfway house within a year.

Denying an individual the ability to possess and use his docket items for the full time of a 15 year sentence is highly uncomplimentary to the American justice system in general and the federal criminal justice system in particular. Citizens assume that their guilty verdicts are subject to a full and fair "check" by all defendants, through the appellate process, even (perhaps especially) those who proceed PRO SE. Jurors presume that the government won't lie to them, and then cover up their lies by threats and intimidation.

Plaintiff understood the process from the beginning. Plaintiff moved for an order to produce the trial transcripts promptly after the jury verdict, using the standard time frame for economy's sake. NDOK 04:09-cr-43, Dkt. 254. Judge Friot denied this request on the ground that Plaintiff hadn't been sentenced. Plaintiff made it clear that he was trying to get the transcripts so he could complete those parts of his appeal brief related to liability, pending sentencing. Judge Friot rejected this unopposed motion on grounds that Plaintiff hadn't been sentenced yet. Id. at Dkt 278.

Plaintiff filed a motion for judgment as a matter of law, and for new trial. Id. at Dkt. 261. Plaintiff doesn't have the trial record, [docket items and docket] but by recollection the motion itself was 18 pages, the brief [Id. at Dkt. 263] was 12. Once again by recollection, the CIVIL local rules limited briefs to 25 pages, and the Criminal Local Rules ARGUABLY incorporated that civil rule, and ARGUABLY DIDN'T. The day after the filing, without any government response, Judge Friot in Dkt. # 264 SUA SPONTE decided that the 1) the local civil rule was incorporated into the local criminal rules, 2) the entire motion was really part of the brief, so he could put the two together to make an arguable 28 page BRIEF, which meant the BRIEF was overlength, 3) he could thus strike every word of it from the record, without notice and without giving Plaintiff any chance to split the combined pleadings into two, or shorten the consolidated pleading by 3 pages, and 4) because this is a time sensitive pleading by rule, its GAME OVER!

Thus we can see the chain of events engineered to deprive Plaintiff of due process:

1) Federal prosecutors "tag-teamed" with state bar officials to suspend Plaintiff pending disbarment in late 2007, so as to take Plaintiff's economic legs out from under him;

2) Indictment was brought after some 5 years of an investigation amounting to first finding the man and then searching for the crime;

3) Plaintiff was denied information about the theory of prosecution, to the extent that government agents shamelessly switched up theories during the trial, until they were all out of theories, in which case they reverted to already admittedly invalid theories, per sworn testimony of government agents;

4) Plaintiff's consolidated motion for new trial and judgment as a matter of law was stricken SUA SPONTE, despite the fact that the length, AT BEST, was a matter of form not substance, since Plaintiff easily could have split the text between two motions, and then Plaintiff was CUT CLEAN OFF from any opportunity to get rulings on the legal issues, because no "cure" of this imaginary defect was allowed;

5) Plaintiff was denied the trial transcript, essential for briefing issues of liability, until Judge Friot could send Plaintiff to jail, at which time he was barred from receiving or possessing the docket and docket items. In this way the government ensured that Plaintiff would NEVER have the chance to EFFECTIVELY brief ANY court on the issues of liability OR punishment;

6) In almost 10 years of incarceration, Plaintiff has been bullied, intimidated, written "shots," kept in SHU on hunger strike for over 400 days, subjected to retaliatory transfer from prison to prison, had his sister Martha Durossette (a Registered Nurse) jailed for trying to visit him 5-21-16, and punished in myriad other ways, for the mere claim of due process; and

7) Plaintiff despite the expenditure of vast amounts of time, money, and paper, is now told that he has not exhausted one single remedy, and as such does not even have "the keys to the courthouse" to litigate the denial of right of reasonable access to the courts, or any other appeal or issue raised over the last 10 years.

Plaintiff doesn't generally attack the credibility of a witness, where the witness has said nothing substantial with respect to any material fact. However, Lisa Singleton is an unmitigated liar, who routinely falsifies records ON THE VERY SYSTEM ABOUT WHICH SHE TESTIFIES. Ms. Singleton issued 5 receipts for BP9s, all of which said the date of submission was 2-1-2020. In fact, none of these BP9s was submitted later than 10-11-19.

Why weren't these administrative remedy requests promptly processed on receipt? It is plain to see that if Plaintiff appeals to Regional after 30 days, SENTRY will show nothing. Garbage in, garbage out. If the computer doesn't show that the appeals were submitted, Regional is going to take the position that the inmate must first exhaust remedies at the institution. Absent processing of the BP9, appealing to Regional is a useless act, which the law does not require. US v. WESTBROOK, 119 F. 3d 1176 (5th Cir. 1997); HENTZ V. HARGETT, 71 F. 3d 1169 (5th Cir. 1996).

By her own admission (whether or not altogether the truth) Ms. Singleton never got these documents in front of Low Warden Christopher Rivers, or Complex Warden David Paul. Now there is a new Acting Complex Warden, Mr. Walter Vereen, and a new warden for the Low named Mr. S. Reiser. To this day there is no response. The question arises, did Ms. Singleton EVER actually present these administrative remedies to any warden? If so, when and why, and what happened? Furthermore, why wasn't Plaintiff told the outcome - even if it was nothing more than studied indifference and silence?

Therefore, nothing Ms. Singleton has to say about the state of administrative remedy records IN ANY CASE should be given any credit. She is not a responsible and reliable individual.

Now the ancient inmate copier in Education, manufactured November 2007, no longer works at all. It's the only one to which inmates have access. Plaintiff has been pleading, on a regular basis, for a new heat roller assembly. That's a cheap item. The copier has been producing garbage for a long time, with unfused toner, and with the loose toner fused all over the rest of the page. Plaintiff has repeatedly shown Ms. Foster, the customary Education worker at FCC Yazoo City Camp, defective copies, along with explanations about precisely why the toner isn't getting fused.

That's exactly the way the Ms. Foster, Ms. Singleton, and a lot of other personnel on this compound want things to be. They want lengthy periods in which the printing/copying equipment simply doesn't work. That makes it hard to prove their evil deeds to the wider world. How does the Plaintiff put documents into the record, when he can't make copies at all? Plaintiff on 3-3-2020 actually saw a heat roller assembly (not the right one for the Camp inmate copier - Plaintiff looked) on a shelf. It is quite possible that this prison complex already has the proper part - but won't install it, for its own nefarious reasons.

If the government or Ms. Singleton thinks this characterization is too harsh, they should feel free to get honest and forthright decisions on the administrative remedy requests that have been pending for many months.

If inmates get the capability to image documents, save the pdfs, print them, email or fax them, etc., this sordid tale comes to an end. No longer will the DOJ-FBOP have "plausible deniability" for the documents submitted to them by inmates. Computers can generate read and delivery requests for emails to responsible DOJ-FBOP authorities. Computers can copy the message to another entity, which can confirm that the message was in fact received on the date claimed by the inmate.

    H.   The docket activity in this case, and in other cases, mandates the relief sought.

Plaintiff filed for IN FORMA PAUPERIS status in this court. Docket #2. The District Court on 8-13-19 directed Plaintiff to supplement his petition with new information, if he wanted further consideration of his motion for IN FORMA PAUPERIS STATUS. Dkt. 14.

Plaintiff at the time had recently received a donation of $2,500 from an attorney from Fort Smith, Arkansas. Plaintiff didn't think he could persuade the Court to grant IN FORMA PAUPERIS status while he technically had enough money to pay for copies with which to serve the complaint.

Plaintiff spent $600 on a printer, and additional sums for paper, etc. Getting a commercial service to print the documents that Plaintiff needed would have cost perhaps $500, or nearly the cost of the printer. Using a commercial service would have been economically devastating, for no good reason.

Furthermore, as the Court can see from the IN FORMA PAUPERIS APPLICATION, Plaintiff spent roughly $1,020 on Trulincs during the second half of 2018. The records provided by FCC Yazoo City show 34 slugs of $30 each, deposited to Trulincs during that time period.

Why can't the Plaintiff wait for a trial for an order concerning his right of reasonable access to the courts? Plaintiff has already explained that the government has DEMONSTRATED its unwillingness to serve Plaintiff with discovery to which he is admittedly entitled. That's not the only thing they'll do, if Plaintiff is forced to litigate crippled by denial of basic resources that no competent lawyer would work without.

The cost of Trulincs is a crushing, unsustainable blow. Plaintiff simply doesn't have the money to effectively litigate this case without access to the customary tools of effective legal writing. Plaintiff most respectfully asks that the Court intervene to prevent oppression and abuse of Plaintiff in this case. Trulincs price gouging is one of the key means by which the DOJ-FBOP suppresses 1st Amendment peaceful petition. That's a key reason why FCC Yazoo City won't let inmates have access to "Fusion" typing devices. Fusions are primitive indeed, but they could allow decent writing for indigent inmates. Their attitude toward such devices demonstrates their motivations for denying computers with professional grade software.

Permission to get computers is salvation of the case and the project. Computers cut Plaintiff's essential spending by perhaps 80%. Computers make it virtually impossible to destroy Plaintiff's litigating capacity.

On 3-5-2020, the 6th Circuit reversed the conviction of Dr. Richard Paulus, who was accused of implanting too many stents in his patients. Government witnesses testified that between 21 and 50% of the stents were unnecessary. The truth of the matter was that the government failed to disclose evidence in its own possession, that the percentage was only 7%.
Plaintiff THINKS that the 6th Circuit suggested that it might have granted a stay pending appeal if it had known this information in a previous appeal.

Plaintiff can't see this case on the DOJ-FBOP's junk "Lexis-Nexis Premium" - although this decision was immediately available to anyone with a subscription to an HONEST legal research system. Plaintiff has to argue this to the court without a cite, and on the basis of some supposition, because he got his information out of the March 7-8, 2020 edition of the Wall Street Journal. The story was entitled "A Court Corrects a Medical Injustice."

Dr. Paulus has thus far endured a nearly 10 year ordeal. Plaintiff has passed the paper along to the next reader, and forgot to make a critical note. However, by recollection Dr. Paulus spent about 9 months in prison, before the 6th Circuit vacated the conviction. Also by recollection, the 6th Circuit panel suggested that it might have granted stay pending appeal, if it had known the facts then as it did at the time of its decision on the merits.

Dr. Paulus doubtless had money and lawyers - which Plaintiff didn't. If Dr. Paulus was relegated to the handicaps imposed on Plaintiff, he almost certainly wouldn't be out of prison now. It is probable that he would have served his term out, before being able to brief the court sufficiently to get the favorable decision he clearly deserved. The worst possible outcome for a PRO SE litigant is pleading the case, inadequately, and thus being barred by a decision not informed by the applicable facts and law. Plenty of indigent defendants, with facts as good or better than those of Dr. Paulus, suffer that ignominious fate.

Plaintiff has been LOCKED UP nearly 10 years. Plaintiff thus far hasn't been able even to prepare a professional quality motion to argue for stay pending appeal. He's never had the transcript and the docket items at the same time. A competent pleading, in a case involving a 3 week trial and 3 day sentencing, such as was the case for Plaintiff, requires good access to BOTH the transcript and docket items, as well as the other resources of an ordinary law firm.

In the Arkansas Democrat-Gazette 3-1-2020 Sunday edition, Mike Masterson wrote an editorial called "Be the Somebody." Sarah Sanders Huckabee, now a 37 year old mother of three, told about hearing about the holocaust at age 11. She asked the age old question. "Why didn't somebody do something?"

Plaintiff is asking for himself because, technically speaking, absent a current law license he CAN'T ask for anyone else. But there is NO CHANCE that Plaintiff is the only innocent person serving time in federal prison, solely because of the DOJ and DOJ-FBOP's obstruction of the right of reasonable access to the courts. In a letter published in the Wall Street Journal shortly after the story about Dr. Paulus, the suggestion was made that 10% of cases (at least some types of cases) involved the conviction and incarceration of innocent persons.

That's opinion not evidence, but it really doesn't matter what percentage of persons remains convicted and incarcerated due to the denial of reasonable access to the courts. One is one too many. One is an indictment of the system. The denial of the tools necessary for reasonable access to the courts, at the inmate's own expense, is proof of evil motives on the part of the engineers of the prosecutorial apparatus.

Guilty persons won't be released because they have access to a computer, and good word processing software, and Lexis-Nexis (the real thing, not the ersatz crap that the DOJ-FBOP calls "Lexis-Nexis Premium") or Westlaw, a printer and copier and basic office equipment and supplies. It just isn't that easy to overturn a jury verdict.

Plaintiff has been stomped on, abused, and vilified for an uninterrupted 10 year quest for due process. FCC Yazoo City is behaving in an utterly paranoid manner, cutting the Plaintiff off from educational resources which, on their own, couldn't possibly allow Plaintiff to prepare a competent brief. For example, they have "Fusion" typing devices, but won't let any inmate use them, despite repeated polite request for the duration of Plaintiff's confinement at this prison complex. Until recently they had computers for learning typing in the Camp Education building. They don't allow the saving of any files, and they aren't hooked to a printer, so they're worthless for the preparation of legal documents. However, during the week of 11-27-2019, soon after Plaintiff asked for a login and password, they were simply taken out, and replaced with nothing. See Mtn for Preliminary Injunction, para. #39.

Of course Mr. Dontae Dennis, ASOE, claims that computers are "on order" but he's made the same claim for 3 years. Dkt. 1, pg. 65. That's solid evidence that he knows computers are essential for education, and that inmates shouldn't be denied access. But a 3 year delay is proof of a total lack of honesty, a total lack of competence, or both.

All the Plaintiff asks for is access to HIS OWN PROPERTY AND RIGHTS TO PROPERTY, for the purpose of preparing and submitting legal pleadings related to his liberty and health interests, etc. Plaintiff certainly cannot concede that the government has the right to subordinate some legal rights but not others, during incarceration.

This is mission critical FOR THESE PROCEEDINGS. Plaintiff has about $500 on his Trulincs account at the present time. That's not enough money for 3 months operations - if the DOJ-FBOP gets to charge $3 per hour for Trulincs, and deprive

15

Plaintiff of the ability to write, save, and edit on ANYTHING.

Plaintiff has long offered to assist other inmates with their educational endeavors. Plaintiff has a GED - and has offered to provide FIRST CLASS assistance to other inmates who need a GED. Plaintiff has 50 hours of nontraditional college credit, mostly CLEP (College Level Examination Program) and offers to help other inmates with a CLEP program. Plaintiff's good faith offers of assistance in these important endeavors are universally spurned.

Consider the message that sends to the public. That says that for the last 10 years, depriving federal inmates is WORTH THE PRICE of crushing educational opportunity, turning it into a total farce. That says that a 45% (or worse) recidivism rate is a FAIR PRICE to pay for the ability to keep KNOWN INNOCENT persons in prison, their convictions intact without regard to law or fact.

The point of this exercise is not to unduly criticize the government or this US Attorney's Office. Plaintiff respects their duty to defend the legitimate legal interests of the United States. However, Plaintiff does not and will not concede that hostility and opposition to the constitutional rights of due process and 1st Amendment peaceful petition constitutes a "legitimate interest" of the United States.

Nothing would please the Plaintiff more than an honest and forthright concession, in response to this pleading. Consider that on Tuesday, 3-3-2020, Plaintiff helped take the hard drives out of about 250 computers, each 6-8 years old, at FCC Yazoo City Medium. If the DOJ-FBOP doesn't want inmates to have their old computers, for whatever reason, that's fine. Other businesses do the same thing, and they'd donate or sell those computers at a cheap price, for the purpose of reducing recidivism.

Plaintiff later in the day came back to help the personnel sort and organize old keyboards, mice, etc., for disposal. They're not worth much, but a lot of them looked like they were nearly new. When Plaintiff left for the day, he politely asked the personnel for 2 Ibico combs. Mr. Brooks, the supervisor of the operation, responded that Plaintiff could put them in the trash, but could not take them.

What kind of organization takes free labor, but won't let the worker have 2 Ibico combs that THEY DON'T EVEN WANT? That's why Plaintiff asked. The Ibico combs were out of their normal place, almost certainly more trouble than they were worth for salvage purposes. The logical thing to do was discard them or give them away. Plaintiff just got through spending 6 days in SHU for complaining about the THEFT of 2 of his Ibico combs, by the mailroom. Apparently, they get to steal from Plaintiff, but he can't even beg and panhandle from them. They'll discard or sell things for a pittance, but won't let Plaintiff have it, or have the use of it, at any price.

The government SHOULD NOT put the Magistrate and the District Court to the trouble of deciding about this issue. All they have to do is to say that they have no objection to the relief sought, and that they will CONFER with Plaintiff to submit to the court a form of order to which they have no objection. This of course would require them to get over the delusion that the phones don't work, between THEIR offices and THEIR prisons.

Plaintiff has to consider the possibility of losing this motion. Ten years of constant, hard effort have not yet borne fruit. If so, two things should be considered. First, such an outcome suggests that indigent defendants can write off due process as soon as the jailhouse door slams behind them. Second, Plaintiff is near to the door. Plaintiff will eventually get access to those things of which the vaunted US Department of Justice has so unceremoniously deprived Plaintiff, and then he will write the brief that he should be writing while still in prison.

In other words, justice can be delayed, which according to the old adage is tantamount to justice denied. It just can't be denied FOREVER. Plaintiff will eventually get his chance, and he will speak, if to no one else to his fellow citizens.

\*      I. If nothing else, Plaintiff should at least get a crumb - the benefit of "cut and paste."

Plaintiff paid the $400 filing fee, and was denied IN FORMA PAUPERIS for service. He effectuated his own service. This is not to complain, but to observe. It is what it is. Plaintiff has always tended to pay for what he gets, and (at least try) to get what he pays for, anyway.

Plaintiff has paid a lot of money for the use of Trulincs. His work product is his own intellectual property. Asking for the ability to move his own work product from one place to another does not falsify Plaintiff's claim that he's asking for nothing more than access to his own property and rights to property, to vindicate his right to due process.

The DOJ-FBOP disabled "cut and paste" on computer functions accessible to inmates, based on evil motives, mostly to illegally obstruct reasonable access to the courts. If the defendants disagree, they should feel free to put forth their own facts and legal authorities, and argue them.

"Cut and paste" is a mere crumb, compared to that to which Plaintiff is lawfully entitled. However, the Court orders the DOJ-FBOP to do this, it will probably save Plaintiff more money than the entire cost of serving the complaint. If Plaintiff was told that the DISABLING of "cut and paste" would be UNDONE, if Plaintiff served his own complaint at his own expense, Plaintiff would have JUMPED ON THAT OFFER LIKE A CHICKEN ON A JUNE BUG.

That lets Plaintiff work on one Trulincs (max size 13,000 characters) until its full, then copy and paste to the next one, so as to ensure that each document comes out to the even page. No more laborious erasing, followed by re-typing. That's a game changer for Plaintiff. For roughly 180,000 federal inmates, it opens up a whole new world of opportunities. We should get this much. It will pay the American public serious dividends, in improvement of correctional outcomes.

Plaintiff is a rules kind of guy. One inch margins all around? That's wonderful. Twelve point text with 11 point footnotes? That's reasonable. Four pages for the motion, 35 for the brief including reply? That's quite generous and perfectly fair, so long as I know in advance. Everybody files electronically and by the rules? What could be more fair??!!

Rules are good. Write good rules, make them available, give everyone a fair chance to comply. Enforce with fair and even hand, making all reasonable efforts not to prejudice substantial rights. It makes the game so much more fun.

In other words, Plaintiff isn't trying to get out of complying with rules. He really doesn't consider that an advantage. Does anyone reasonably think Plaintiff likes filing pleadings that basically make him look STUPID and CHILDISH? Of course not. Plaintiff is just asking for a FAIR CHANCE to follow the rules, as opposed to forgiveness for not doing it. Plaintiff likes rules enforced evenhandedly. He should get as well as give.

"Cut and paste" alone doesn't allow Plaintiff to actually follow court rules, but it does let him get better. By this request, Plaintiff is not waiving anything else he requested. For example, getting some kind of "wordpad" type function, so as to copy and paste research from "Lexis-Nexis Premium" would be highly beneficial and should be done. Forcing the DOJ-FBOP to follow their own rules about timing out Trulincs documents should be enforced. But that's not the most basic crumb.

The most basic crumb involves freedom of obstruction of the ability to cut blocks of text one place, and move it to another. What we draft on Trulincs, at great cost to us, is our intellectual property, whether good or bad. If nothing else is to be granted, Plaintiff most respectfully requests that he and his fellow federal prisoners get at least this much.

   J. The government's own stated claims are that it respects due process and peaceful petition
      support Plaintiff's requested relief.

Plaintiff practiced law for some 19 years before coming to prison. Plaintiff has been inside US Attorneys' offices on official business, on various occasions.

Plaintiff has seen a nice decorative plaque on the wall of US Attorneys' offices, with words to the effect "the prosecutor is authorized to strike hard blows, but never foul." It also has words to the effect "the government wins when justice is done." Plaintiff can't recite these words specifically - its been over 10 years, not that Plaintiff could recite verbatim any such statements

the next day after reading them. For Plaintiff as for most people, the palest ink beats the sharpest mind.

Plaintiff's claim in this motion for a temporary injunction involves the vindication of rights THE GOVERNMENT ITSELF claims to scrupulously observe. They just don't. Their words don't match their actions.

Plaintiff has fought a long, hard, bitter battle, not just for himself, but for every person the $30 billion per year DOJ has crushed with its relentless war on due process and peaceful petition. Plaintiff is battle weary, but cannot and will not stop - ever. Injustice anywhere is a threat to justice everywhere.

That's why this motion cannot possibly become moot, until each and every inmate in federal custody, whether in a contract facility or in a DOJ-FBOP facility, is permitted to ACCESS first class equipment and information, comparable to that which the AUSAs use to advocate on behalf of the government. That's not a claim of RIGHT TO THOSE THINGS at the expense of others, but a claim of right of FREEDOM FROM INTERFERENCE with the possession and use of such things by an inmate who possesses or lawfully acquires such property and rights to property.

A man who is guilty when stripped of the tools of effective legal writing, but not when consistently armed with the best writing and research tools available to the legal profession, is NOT GUILTY AT ALL!!!

Plaintiff in ten years of incarceration has never bought a new pair of shoes. Look on the commissary receipts - Plaintiff has never bought a pair. Plaintiff has to his recollection has never spent more than 10 postage stamps on a pair of of used shoes. Plaintiff has worn plenty of shoes discarded by other inmates - including at times mismatched shoes, when need and opportunity coincided. Plaintiff has scavenged food on a regular basis for extended periods of time, and engaged in a plethora of other penny pinching tactics, to conserve funds for his precious Trulincs.

At the present, Trulincs is the means by which Plaintiff expresses himself, and reaches out to the wider world. Nothing is more important to Plaintiff than due process and 1st Amendment peaceful petition. Nothing is further out of reach, due to the evil deeds of the DOJ and DOJ-FBOP. It is those evil deeds that Plaintiff hopes to stop, by the power vested in this Honorable Court.

Consider the words of the US Supreme Court in BOUNDS V. SMITH, supra, in the footnote at the very end of the opinion. The Court said "The record reflects that prison officials in no way interfered with inmates' use of their own resources in filing collateral attacks. ..."

Plaintiff complains of nothing else. Furthermore, the things to which Plaintiff seeks access are those things to which he had undeniable access on the day before going to jail, and things that are known to be available in prison. Take a look at the offer of donation. Dkt. #1, Ex. 126. It has two sections, one for things well known to be available to some federal prison inmates, and one for things not certainly known to be so available to federal prisoners. Basically, the second category involves internet access to legal research resources.

However, the very EXISTENCE of a Pilot Program for Inmate Electronic Filing NECESSARILY PRESUMES that at least some internet service is available to some inmates. Plus, what is the logic for saying that a person who could be trusted with PACER, Recapthelaw, Lexis-Nexis, Westlaw, WordPerfect, and access to all sorts of free legal resources such as older versions of the Code of Federal Regulations, on the DAY OF going to prison, is on the FOLLOWING DAY dangerous merely for having enough access to ANY OF SUCH THINGS to vindicate his own bona fide legal rights?

Plaintiff has shown sufficient facts, in light of existing law, that he should be granted the preliminary injunction requested by his motion filed contemporaneously herewith. The government's motion to dismiss should be denied.

)
By: _____          3-24-2020
Oscar Stilley                                 Date
FCC Yazoo City Camp
PO Box 5000
Yazoo City, MS 39194

CERTIFICATE OF SERVICE - PRISON MAILBOX RULE

Plaintiff by his signature above states under penalty of perjury pursuant to 28 USC 1746 that on the date stated above he placed a copy of this pleading in the prison outgoing mail receptacle, with sufficient 1st class postage attached, addressed to the clerk of the court for filing and service via CM/ECF.   18